UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID HYNES,

                Plaintiff,                        CASE NO. 04-70305

-vs-                                       PAUL D. BORMAN
                                            UNITED STATES DISTRICT JUDGE

ELECTRONIC DATA SYSTEMS
CORPORATION,

                Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## BACKGROUND:

David Hynes ("Plaintiff") contends he was discharged in violation of his rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq*; and the Elliot-Larsen Civil Rights Act ("ELCRA"), MCL §37.2101, *et seq.* Plaintiff contends he was discriminated against on the basis of religion and in retaliation for having opposed discrimination on the basis of religion. (Plaintiff's Complaint at 4-5).

Plaintiff began his employment with Electronic Data Systems ("EDS") in November, 1999. He worked for EDS in a customer service call center. (Plaintiff's Dep. Vol. I at 61). Plaintiff worked as a call center representative associate commonly referred to as an "advisor" on the Case Management Team that supported EDS' client General Motors ("GM"). (*Id.* Vol. II at 16). Plaintiff's position entailed receiving and placing telephone calls to OnStar users to answer inquiries, resolve problems, and promote services. (*Id.* Vol. I at 80).

Plaintiff does not ascribe to an organized religion. (Plaintiff's Dep. Vol. I at 11).

1

Plaintiff adheres to a "code of living" that he is developing over time.  (*Id.* at 40).  Plaintiff

testified that his core belief is that things are always changing.  (*Id.* at 9-10).

In 2001, Service Relations Supervisor Gayle Berryhill was Plaintiff's direct supervisor.

(Plaintiff's Dep. Vol. II at 37).  Berryhill reported to the Service Relations Manager.  Elizabeth

LaBarge temporarily filled the vacant Service Relations Manager position, and Cynthia

Lesperance permanently filled the position in January, 2002.  (Lesperance Dep. at 11-12).  The

Service Relations Manager reported to the Account Manager, Karen Horton.  (LaBarge Dep. at

22-23).

One of Plaintiff's critical duties included adhering to GM's requirements regarding

OnStar customer "call backs," or follow-up calls.  (*Id.* at 83).  Under EDS' contract with GM, all

OnStar customers had to be contacted within 24 hours of their initial call to the call center, and

every 48 hours thereafter unless the customer requested otherwise.  (*Id.* at 83, Lesperance Dep.

at 33).

In May, 2001, Plaintiff was warned by his supervisors that his percentages for customer

call backs were unacceptably low.  (EDS' Motion, Ex. A).  On June 14, 2001, Berryhill spoke

with Plaintiff regarding his customer call backs, and told him that his performance relating to

customer call backs were unacceptably lower than his peers.  (*Id.* Ex. B).

The Case Management Team advisors were assessed in the key areas of case

management, case closure, and quality on a monthly basis.  (EDS' Motion, Lesperance Dec.; Ex.

E).  In the assessment each advisor received a letter score with "A" being the highest and "C" the

lowest relative to his overall numerical score.  (*Id.*).  Advisors at level "C" were cautioned that

failure to improve could result in disciplinary action, up to and including termination.  (*Id.*).  In

2

the July-August assessment, Plaintiff received a score of 1.8, placing him at the "C" level status.

(Plaintiff's Dep. Vol. II at 57-58, EDS' Motion, Lesperance Dec. E, Ex. C).  As a result of this

rating, Berryhill counseled Plaintiff, and her notes provided:

> James Brown and Gayle Berryhill had a conversation with David Hynes regarding his
> current status.  Dave was advised that his productivity is being monitored and that he is
> expected to be meeting expectations of at least a "B" level by August 31, 2001 or else
> disciplinary action up to and including separation may occur.  David stated he understood
> and would try his best.

(EDS' Motion, Ex. C).  Although the performance assessment is dated October 30, 2001 (the

date Berryhill filled out the assessment) it was not presented to Plaintiff for his review and

signature until February 13, 2002.  (Labarge Dep. at 98).

In Plaintiff's 2001 annual performance assessment, his performance rating placed him in

the bottom quarter of the employees in his group.  (*Id.* Ex. 9).  Plaintiff was rated as a

"Developmental contributor."  In the annual performance assessment, EDS employees were

placed in one of five performance categories (Exemplary - top 10%; Significant Contributor - top

11% to 25%; Valued Contributor - middle 50%; Developmental Contributor - bottom 25% to

11%; and Major Development Required - bottom 10%).

With this backdrop of performance related problems, Plaintiff began to take issue with

what he perceived as religious messages in the call center.  Plaintiff objected to emails sent by

his co-workers.  For instance, Plaintiff objected to his co-worker Sheri Ferris' email which

provided:

> Hello everyone I just wanted to thank each and everyone of you for your prayers for my
> recovery.  I (sic) glad to say that I'm doing just fine and feeling 100% better!  Again
> thank you for prayers and concerns!  To you Renesia thanks for being concerned and
> being a good best friend!!! May God bless and keep each and everyone of you!!!

(EDS' Motion, Ex. 24).  Plaintiff responded to Ferris' email stating "this is work, not church."

(*Id.*).  Plaintiff also objected to a co-worker's inclusion of a poem after the signature portion of

an email titled "Everything I Need to Know I Learned From Noah's Ark" which provided:

> One: Don't miss the boat.
> Two: Remember that we are all in the same boat.
> Three: Plan ahead.  It wasn't raining when Noah built the Ark.
> Four: Stay fit.  When you're 60 years old, someone may ask you to do something really big.
> Five: Don't listen to critics; just get on with the job that needs to be done.
> Six: Build your future on high ground.
> Seven: For safety's sake, travel in pairs.
> Eight: Speed isn't always an advantage.  The snails were on board with the cheetahs.
> Nine: When you're stressed, float a while.
> Ten: Remember, the Ark was built by amateurs; the Titanic by professionals.
> Eleven: No matter the storm, when you are with God, there's always a rainbow waiting.

(*Id.* Ex. 34).

While working one Sunday, Plaintiff chose to sit in a cubicle which was assigned to

another coworker.  (Plaintiff's Dep. Vol. II at 20-21).  Plaintiff discovered a prayer posted in the

cubicle.  (*Id.* at 20-21).  Plaintiff took the flyer down and brought it to his supervisor's attention,

and requested that EDS send out an email stating that "religious items (including scriptures,

poems, sayings, etc.) posted on cubicles are not encouraged or appreciated."  (*Id.*; Ex. 27).   The

supervisor responded to Plaintiff stating:

> David we will research this.  There could be an issue of freedom of speech and freedom of religion.  I do not know, but in the mean time why don't you sit at your desk.  Please do not remove items in other peoples cubes for they are their personal items.  I will not be sending an e-mail out until leadership research this further.

(*Id.*).  Plaintiff also complained about a co-worker who wore what he described as an

"evangelistic" tie.  (Plaintiff's Dep. Vol. II at 110-112).

Plaintiff demanded on November 12, 2001, that EDS leadership issue a blanket email to

all EDS employees on the OnStar account banning religious messages in the workplace.

4

(Plaintiff's Dep. Vol. I at 33-34).  Plaintiff's supervisors responded by telling Plaintiff that they would not send a blanket email because it would demonstrate insensitivity to the religious views of other employees.  (*Id.* Exs. 27, 28, 30).  LaBarge testified that he followed up with Plaintiff and explicitly instructed him not to send such an email himself.  (LaBarge Dep. at 56).

Berryhill and LaBarge offered Plaintiff three options to shield him from messages he found offensive: (1) supervisors would conduct team meetings that would address the issue of appropriate forms of religion in the workplace; (2) elimination of Plaintiff's name from the Customer Care distribution list so that he would not receive emails from his co-workers; or (3) Berryhill would receive his email and redact any references to religion.  (*Id.* Ex. 36).  Plaintiff was not satisfied with these options.  (*Id.*).

Plaintiff worked at EDS during the 1999 and 2000 holiday seasons without incident. (Plaintiff's Dep. Vol. I at 28-29).  In 2001, Plaintiff began complaining about references to Christmas or New Year's Day.  (*Id.* at 76).

On December 24, 2001, Plaintiff, despite being told not to, sent an email message labeled "Religious Politeness" to all Customer Care employees and also included EDS' client GM. (EDS' Motion, Ex. 23, LaBarge Dep. 57, 59-61).  The email provided:

> Please refrain from sending any E-mail that contains information of a "**religious connotative manner"** directly to me personally and remove my name from your distribution lists when sending this type of information.  This would especially include information about religious celebrations and blessings from each and every God - no matter what your intention is.  Please do not feel that you are being impolite by not including me when you bake and bring into work religious holiday cookies, exchange religious holiday gifts at work and such, even if you personally are not celebrating the religious holiday for religious purposes, because it is still based upon a specific religions (sic) holiday to which I am not allowed to participate in.  Thank you, my intention in sending this E-mail is to keep these type of E-mails from being sent to me personally. This "could", if you so choose, be a time for personal reflection because when we send E-mails like these we never know who we could be offending and we do not know if

5

these actions are breaking the traditional religious rules and values of another's religion
or are offensive oppressive symbols that everyone does not appreciate to see appear in
there (sic) E-mail.

(*Id.* Ex. 23) (emphasis in original).  LaBarge testified that this email caused considerable

disruption among the employees:

> people starting replying back and forth to the e-mail, almost debating it.  It also caused
> gossip on the floor because up to this point, he had sent this e-mail to everybody,
> including GM, including people that were in a different building on Stevenson Highway
> that would have known nothing about what had all happened.  He basically put his
> concern out in front of everyone when it wasn't there before, which caused everybody to
> start talking about it, discussing it, when that was exactly what we wouldn't want.  It's
> not the appropriate way to handle it.

(LaBarge Dep. at 57-58).  LaBarge then sent Plaintiff home on paid leave and testified that after

a good hour-long conversation talking about why things offended him she "told him that he was

no longer doing the job he was being paid to do.  He was doing other things besides his job, and

that until I knew what the next step was going to be, I had to send him home because I didn't

know at that point what would be the next step."  (*Id.* at 76).

LaBarge along with Horton and Berryhill decided that a final warning regarding his

productivity and not creating a disruption in the workplace by sharing your personal thoughts

and views.  (EDS' Motion, Ex. 8).  The warning required that Plaintiff maintain acceptable

levels of productivity and indicated that failure to do so could lead to his discharge.  (*Id.*).  The

warning in its entirety provided:

> On December 18, 2001, I met with you and Gayle Berryhill to discuss your concerns
> regarding your exposure to religion and celebrating the EDS "holidays" in our center.  At
> the close of this meeting, I presented you with some possible options to handle the
> situation and stated that you should handle any future concerns regarding these two
> issues directly with Gayle.  We also discussed the importance of not creating a disruption
> in the workplace by sharing your personal thoughts and views.  I discussed with you my
> position regarding how the EDS/Onstar center handles holiday events and that it would
> not be appropriate to send any type of email to try and change this situation.  I also

6

discussed with you that it is the responsibility of the leadership team to address any concerns or issues with employees and that you did not have authorization to take on that responsibility.

During the time period of December 23-25, 2001, you caused a disruption in the workplace by being insubordinate.  Your performance over these three days was severely reduced due to the amount of time and effort that you applied to emails regarding your position on celebrating holidays.  You caused a disruption by sending the emails that impacted the performance of other employees and supervision by taking the focus of the team from assisting customers and solving their concerns.  Such conduct is inappropriate and will not be tolerated.  Specifically, effective today:

> You must focus on your productivity and performance as a member of the case manager team.  You will meet on a weekly basis with your supervisor, Gayle Berryhill, to discuss your productivity for the previous week and set goals for the next week.  You must meet these weekly goals; not meeting these performance goals is a violation of this warning.

> You will be scheduled to work from 10:00am to 7:00pm, Monday through Friday each week.  Any schedule changes must be approved by your supervisor, Gayle Berryhill.

> You will not respond via email to any EDS/Onstar center-wide emails that you have concerns with.  You will only use EDS/Onstar email to assist you in performing your job responsibilities.  You must schedule a meeting in person with your supervisor to discuss any email concerns and allow the supervisor to respond and handle the situation.

> You must not discuss any concerns that you have with other advisors with them directly.  You must schedule a meeting in person with your supervisor to discuss these issues.  It is the leadership's responsibility to handle these situations.

> You must not bring or use a camera or any type of recording device into the center without written consent from a manager of the EDS/Onstar team.

As indicated, improvement must occur immediately and must be maintained.  Any deviation from the above requirements or any other violation of EDS policy will not be tolerated.

As always, the Open Door Policy is available to you to discuss any concerns.

(*Id.*).  The warning finally stated above the signature line the following:

> I ACKNOWLEDGE THAT I HAVE RECEIVED A COPY OF THIS WARNING.

7

FURTHERMORE, I ACKNOWLEDGE THAT THE REQUIREMENTS OF THE WARNING HAVE BEEN EXPLAINED TO ME AND I FULLY UNDERSTAND THAT MY FAILURE TO FOLLOW THESE REQUIREMENTS MAY RESULT IN THE IMMEDIATEL (sic) TERMINATION OF MY EMPLOYMENT FROM EDS.

(*Id.*).

As stated previously, EDS' objective for timely callbacks is for its employees to complete greater than 98% of 24 hour callbacks and the 48-hour callbacks 87% of the time. During this period Plaintiff had a 29.6% case management rate.  (*Id.* Ex. G).  A random audit was also conducted relating to Plaintiff's performance on February 19, 2002.  (*Id.* Ex. 15). Berryhill sent an email to Lesperance which provided in part:

Per your request, attached is the documentation regarding David Hynes.  David Hynes was issued the attached warning on January 15, 2002.  On 1/22/02 David and I met to discuss his performance and productivity requirements.  David was advised that he is to be completing an initial 24 hour call back on all cases as well as a 48 hour callback on every case unless agreed upon otherwise with the customer.  At the time, Dave stated he understood.

On 2/14/02 Rachel and I met with David and discussed his transition to Rachel's team and that the expectation of an initial 24 hour callback and 48 hour follow-ups was expected.  Dave was advised that if he was experiencing issues in meeting those expectations he must communicate to either Rachel or myself....

A random audit was performed on Dave's cases as of 2/19/02 and seven examples of poor case handling were discovered including the lack of 24 hour initial callbacks and 48 hour follow-up calls.  Several examples indicated no contact to the customer since they had been assigned to David by Rachel Reyst-Carroll on February 7, 2002 (12 days without ANY contact to the customer).

On multiple occasions other members of leadership as well as the client have expressed concern regarding the quality of work Dave has been handling within the case manager team....

(*Id.*).  Lesperance testified that EDS's client, GM had expressed concern regarding the quality of Plaintiff's work.  (Lesperance Dep. at 72).  Lesperance ultimately decided to discharge Plaintiff after reviewing his documented performance record and discussing the decision with her

8

manager Horton and EDS' Employee Relations Department who concurred in Lesperance's decision. (*Id.* at 29). Plaintiff was discharged on February 20, 2002. (*Id.* at 78-79).

EDS filed its motion for summary judgment on March 24, 2005. Plaintiff responded on April 18, 2005 and EDS replied on May 6, 2005. Oral argument occurred on June 7, 2005.

**ARGUMENTS:**

    **1.    EDS' Argument**

EDS argues that Plaintiff has failed to state a prima facie case of religious discrimination because he has not demonstrated that he was qualified for the position or that he was treated differently than a similarly situated employee outside the protected class. (EDS' Motion at 12). EDS also argues that it has articulated a legitimate business reason for Plaintiff's termination, namely Plaintiff's lack of productivity. (*Id.* at 14). EDS contends Plaintiff's emails and other activities aimed towards stopping religious references in the workplace prevented him from doing what he was paid to do - work. (*Id.*). EDS also contends that Plaintiff's retaliation claim fails because he did not engage in protected activity and has not shown that there is a causal connection between the protected activity and the adverse employment action. (*Id.* at 17).

    **2.    Plaintiff's Argument**

Plaintiff contends that he was discharged because of his particular beliefs relating to religion, and that EDS' proffered reasons for his discharge are pretextual because his job performance was no worse than his co-workers. (Plaintiff's Response, at 10). Plaintiff also argues that the temporal proximity between his complaints to EDS and his discharge establishes a causal connection between his complaints and discharge. (*Id.* at 14). Plaintiff further argues that his EEOC determination supports his claim that he was terminated because of religion and

discharged in retaliation for his complaints about religion.  Plaintiff also argues that Berryhill's

notes and performance evaluations pertaining to his job performance are inadmissible hearsay.

(*Id.*).

## ANALYSIS:

### A.       Standard for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim,

counterclaim, or cross-claim is asserted may "at any time, move with or without supporting

affidavits, for a summary judgment in the party's favor as to all or any part thereof."  Fed. R.

Civ. P. 56(b).  Summary judgment is appropriate where the moving party demonstrates that there

is no genuine issue of material fact as to the existence of an essential element of the nonmoving

party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

*Id*. at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that

fact "would have [the] effect of establishing or refuting one of the essential elements of a cause

of action or defense asserted by the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.

1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted).  A dispute over a

material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

10

Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-1211 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see also Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

**B.     Discussion**

To demonstrate a prima facie case of religious discrimination under Title VII, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was subject to an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by someone outside the protected class or was treated less favorably than a similarly situated employee outside the protected class. *Hall v. Baptist Mem'l Health Care Corp.,* 215 F.3d 618, 626 (6th Cir.

11

2000).[1]

Under Michigan and Federal law, where there is no direct evidence to establish a question of fact on discriminatory intent, Courts turn to the *McDonnell Douglas v. Green,* 411 U.S. 792 (1973) burden shifting framework.  Under *McDonnell Douglas* a plaintiff has the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. *McDonnell Douglas* 411 U.S. at 802; *Dubey v. Stroh Brewery Co.,* 185 Mich. App. 561 (1990). If plaintiff succeeds in establishing a prima facie case, the burden shifts to defendant to articulate some nondiscriminatory reason for the adverse action.  *St Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993).  Plaintiff must then prove that the reason put forth by the defendant was a mere pretext for discrimination.  *McDonnell Douglas,* 411 U.S. at 802.

Defendant contends that Plaintiff cannot establish a prima facie case of religious discrimination because he cannot show he is a member of a protected class.  Plaintiff's core belief is in "impermanence," or the notion that things are always changing and does not identify himself as an atheist or an agnostic.  (Plaintiff's Dep. Vol. I at 39-40).  EDS contends that Plaintiff's mere personal view of the static nature of life is not tantamount to a religious belief protected by law.  Plaintiff contends that he need not adhere to a bona fide religious belief in order to qualify for protection under Title VII and the ELCRA.  Plaintiff claims that he was discriminated against because of his non-conformity with the employer's beliefs.  Plaintiff cites several cases to support his argument.

In *Shapolia v. Los Alamos Nat. Lab,* 773 F. Supp. 304 (D. N.M. 1991) the defendant

---

[1]The prima facie case for religious discrimination under the ELCRA is nearly identical. *Singal v. Gen. Motors Corp.,* 179 Mich. App. 497, 503 (Mich. App. 1989).

brought a Federal Rule of Civil Procedure 12(b)(6) motion arguing that the plaintiff failed to

state a claim upon which relief can be granted under Title VII.  The plaintiff argued that he was

discharged by his employer for failing to adhere to the Mormon faith.  The Court found that

> Title VII is a neutral provision which entitles every employee, believer or atheist to a
> reasonable accommodation of his religious beliefs and practices.  Surely, Title VII
> forbids requiring "religious conformity" in order to receive the fair and equal treatment
> by an employer.

(*Id.* at 305).  The Court finds that Title VII and the ELCRA[2] forbid an employer from

discriminating against an employee because that employee does not adhere to the employer's

religious beliefs.  Thus, the issue before the Court is whether Plaintiff can demonstrate that he

was discriminated against by EDS management because of his non-conformity with EDS'

religious beliefs.

As an initial matter, the Court notes that Plaintiff's complaints to EDS relating to religion

were directed at his co-workers' emails and activities.  There is no evidence that EDS

management forced, or even encouraged Plaintiff to attend an EDS sponsored religious event.  In

fact, there is evidence before the Court demonstrating that Plaintiff's supervisors attempted to

work with him and accommodate his requests.  Berryhill and LaBarge offered Plaintiff three

options to shield him from messages he found offensive: (1) supervisors would conduct team

meetings that would address the issue of appropriate forms of religion in the workplace; (2)

elimination of Plaintiff's name from the Customer Care distribution list so that he would not

receive emails from his co-workers; or (3) Berryhill would receive his email and redact any

references to religion.  (EDS' Motion, Ex. 36).  Plaintiff was not satisfied with these options.

---

[2]See *Cline v. The Auto Body Shop, Inc.,* 241 Mich. App. 155 (Mich. App. 2000).

(*Id.*).

Plaintiff has not brought forth evidence by way of his testimony or otherwise to show that other employees were favored by EDS management because of their religious beliefs. Further, Plaintiff has not shown that a similarly situated employee was treated better than he. EDS contends, and the Court agrees that other than Plaintiff, no team member had a similar history of unacceptably low productivity, sent a blanket email to all email users after being forbidden to send such an email, was placed on a final warning for low productivity and insubordinate behavior, and committed objectively low productivity in violation of the warning.

In *Cline v. The Auto Body Shop, Inc.,* 241 Mich. App. 155 (Mich. App. 2000), a former agnostic employee brought a religious discrimination against his former employer, its owner and his wife. In *Cline,* the plaintiff's compensation, job assignments and the ability for advancement were all dependent on his attendance at the defendant's church. The plaintiff quit his job because he could not work with the pressures of having to go to church. The Michigan Court of Appeals found that if an employer disfavors an employee because the employee is not in conformity with the employer's religion this action violates the ELCRA. (*Id.* at 158). The Court, however, finds that Plaintiff has failed to demonstrated that he was discriminated against because of his non-conformity with EDS' alleged religion. In the instant case, unlike *Cline,* there is no evidence that EDS management forced, or even encouraged Plaintiff to attend an EDS sponsored religious event. In fact, Plaintiff's supervisors attempted to work with him and accommodate his requests.

The Court also finds that Plaintiff has not established that he was qualified for his position. A plaintiff must prove "that he was performing his job at a level which met his

14

employer's legitimate expectations, in order to prove that he was qualified for the job in controversy." *Godfredson v. Hess & Clark, Inc.,* 173 F.3d 365, 372 (6th Cir. 1999) (citations omitted).

      *McIntyre-Handy v. West Telemarketing Corp.,* 97 F.Supp. 2d 718 (E.D. Va. 2000) is instructive. In *West,* the plaintiff, a telemarketer, requested that she not be required to answer calls for West's Christian-affiliated clients. The defendant accommodated her request, and transferred her to the psychic line group, which did not receive calls on behalf of Christian affiliated clients. The defendant, who monitored its employees' telemarketing calls, recorded the plaintiff being rude to a customer, giving her own advice to the callers and not reading the legally required script material. The defendant discharged the plaintiff. The plaintiff argued that defendant unlawfully discharged her based upon her beliefs as an atheist. The Court rejected this argument and granted the defendant's summary judgment motion. The Court stated:

> [w]hile plaintiff may not *believe* that defendant terminated her for that behavior, the uncontroverted evidence before this court is that plaintiff violated a clearly stated company policy which she knew could result in immediate termination, and that she was, in fact, so terminated. The law simply cannot permit recovery based upon a plaintiff's subjective belief regarding an employer's motivation, where it is clear contradicted by the objective evidence before the court.

(*Id.* at 732) (emphasis in original). Similarly here, the Court finds that Plaintiff's subjective belief that his religious views were the reason he was discharged insufficient to create a genuine issue of material fact. Further, there is evidence before the Court pertaining to Plaintiff's lack of productivity, particularly after he was placed on final warning. Plaintiff contends that the final warning is evidence of discrimination particularly because it selectively enforced EDS email policy. The Court, however, finds that a plain reading of the final warning shows that it stemmed from Plaintiff's insubordination and lack of production, and there is no reference to

15

EDS' email policy.

The Court finds that EDS has brought forth objective evidence relating to Plaintiff's performance which precludes him from proving that he was meeting EDS' expectations.[3] As noted above, EDS conducted a random audit relating to Plaintiff's performance on February 19, 2002. (EDS Motion, Ex. 15). Berryhill sent an email to Lesperance which provided in part:

> Per your request, attached is the documentation regarding David Hynes. David Hynes was issued the attached warning on January 15, 2002. On 1/22/02 David and I met to discuss his performance and productivity requirements. David was advised that he is to be completing an initial 24 hour call back on all cases as well as a 48 hour callback on every case unless agreed upon otherwise with the customer. At the time, Dave stated he understood.
>
> On 2/14/02 Rachel and I met with David and discussed his transition to Rachel's team and that the expectation of an initial 24 hour callback and 48 hour follow-ups was expected. Dave was advised that if he was experiencing issues in meeting those expectations he must communicate to either Rachel or myself....
>
> A random audit was performed on Dave's cases as of 2/19/02 and seven examples of poor case handling were discovered including the lack of 24 hour initial callbacks and 48 hour follow-up calls. Several examples indicated no contact to the customer since they had been assigned to David by Rachel Reyst-Carroll on February 7, 2002 (12 days without ANY contact to the customer).
>
> On multiple occasions other members of leadership as well as the client have expressed concern regarding the quality of work Dave has been handling within the case manager team....

(*Id.*).

The Court also notes that there is evidence that EDS' client, GM had expressed concern over Plaintiff's quality of work. (*Id.* Ex. 15). EDS contends that Plaintiff's emails and other activities aimed towards stopping religious references in the workplace prevented him from

_____

[3]Further, the Court finds that even if Plaintiff were to establish a prima facie case of religious discrimination, based upon his job performance, he has not shown the EDS' reason for his discharge was pretextual.

16

doing what he was paid to do - work.  Instead, EDS contends he spent his time composing

lengthy emails to EDS leaders and responding to his co-workers who made the mistake of

wishing him a happy holiday, or offending his sensibilities.  For example, EDS contends that

from December 24 to December 25, Plaintiff performed work on only two cases, in contrast to

December 23 (a more typical day), Plaintiff worked on 15 cases.  (Lesperance Dec. ¶¶9-13).

Plaintiff cites the testimony of Rachel Reyst-Carroll who supervised Plaintiff for two

weeks.  Reyst-Carroll testified as follows:

Q.  How was [Plaintiff's] work when you were supervising him?

A.  I did not have an opportunity to reprimand him during that time frame.  As far as I
remember he was taking care of his caseload in the same manner as the other people.  He
didn't distinguish himself, nor was he at the bottom of his caseload.  So as far as
productivity, I didn't see that he was any worse than other people necessarily.

Q.  Was there a rule for the advisors like David, that you had to make a call back to the
customer within 24 hours, and then again, within 48 hours?

A.  Yes.

Q.  Did everyone successfully do that all the time?

A.  No, unfortunately we had a very large caseload from time to time.  Sometimes it
fluctuated.  That was what we strove for.  It didn't always occur.

Q.  During the time that you supervised David, during that short time, were you aware of
David not successfully doing that on any cases?

A.  I don't specifically remember that, but it is possible.  It is very possible that has
occurred.  I don't honestly remember the particulars of what occurred at that time.

Q.  Sure. Who were you supervising before you supervised David?

A.  I had a team of people.

Q.  Did they just shift him over to your team, or did you - -

A.  Yes.

Q.  - - go over –

A.  No, they just moved him to my team.

Q.  I see.

A.  And honestly, it wasn't a physical move.  It was just, here, we're going to give you his paperwork kind of thing.  He stayed in the same desk.

(Plaintiff's Response, Reyst-Carroll Dep. at 13-14).

Importantly, Resyt-Carroll further testified:

Q.  Did you have occasion to supervise the Plaintiff, David Hynes?

A.  I was his supervisor technically for the last couple of weeks before he left, but I honestly did not interact with him in that two weeks.  It was nothing that I specifically supervised him on.

(EDS' Motion, Reyst-Carroll Dep. at 10).

The Court finds that Reyst-Carroll's testimony, viewed in a light most favorable to Plaintiff, does not support Plaintiff's claim that he was discriminated against because of her limited contact with Plaintiff.  Reyst-Carroll testified that she "did not interact with him" and that there was nothing she "specifically supervised him on."  Instead, Reyst-Carroll testified that she was "technically" his supervisor for two weeks and she could not remember any "particulars at that time."

In sum, the Court holds that Plaintiff cannot demonstrate that he was discriminated against by EDS management because of his non-conformity with EDS' religious beliefs.  The Court also holds that Plaintiff has failed to state a prima facie case of religious discrimination because he has not demonstrated that he was qualified for the position or that he was treated differently than a similarly situated employee outside the protected class.  Accordingly, EDS is entitled to summary judgment on Plaintiff's religious discrimination claim.

18

2.        **Retaliation Claim**

Plaintiff asserts a retaliation claim under Title VII and the ELCRA. Plaintiff alleges that he was terminated because he complained to EDS about religious discrimination.  To establish a prima facie case for retaliation, Plaintiff must show that: (1) he engaged in a protected activity; (2) EDS knew of this exercise of his protected rights; (3) EDS consequently took an employment action adverse to Plaintiff; and (4) there is a causal connection between the protected activity and the adverse employment action.  *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 792 (6th Cir. 2000); *Meyer v. City of Center Line,* 242 Mich. App. 560, 619 (Mich. App. 2000).

EDS contends to the extent that Plaintiff's complaints were directed at Christmas activities, he did not engage in protected activity because they were not based on religious conduct.  EDS cites *Wessling v. Kroger Co.,* 554 F. Supp. 548, 552 (E.D. Mich. 1982).  In *Wessling*, the Court held that an employee's request for time off to set up and decorate a church hall for a children's Christmas play was not a religious observance protected by Title VII.  The Court provided:

> [t]he plaintiff's request to appear at the church hall to set up for the church play, receive the children, and decorate, was not a religious observance protected by Title VII.  It was voluntary, others could have substituted.  The early attendance at the church hall was social in nature.  It was far more extensive in time than necessary for religion.  It was family oriented, a family obligation, not a religious obligation.

(*Id.* at 552). Further, the Court notes that courts have consistently held that the Christmas holiday as a legal public holiday is constitutional because of its secular cultural aspects.  Further, as Justice Blackman stated in *County of Allegheny v. ACLU Greater Pittsburgh Chapter,* 492 U.S. 573 (1989) in addressing whether a Christmas tree and a menorah display violated the Establishment clause:

19

the relevant question for Establishment Clause purposes is whether the combined display of the tree, the sign and the menorah has the effect of endorsing both Christian and Jewish faiths, or rather simply recognizes that both Christmas and Chanukah are part of the same winter-holiday season, which had attained a secular status in our society. Of the two interpretations of this particular display, the latter seems far more plausible and is also in line with *Lynch*.

(*Id.* at 616). On the other hand, Plaintiff did complain about other religious references not specifically pertaining to Christmas or New Years Day. As set forth below, the Court still finds that Plaintiff did not engage in protected activity because his complaints were directed at the conduct of his co-workers, and he never complained, or alleged that EDS' management engaged in unlawful religious discrimination.

With Title VII and ELCRA retaliation claims, there are two types of protected conduct. As the Sixth Circuit stated:

As with Title VII, Elliott-Larsen prohibits conduct by an employer in two situations: (1) when an employee 'has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under [Elliott-Larsen],' the participation clause; or (2) when an employee 'has opposed a violation of [Elliott-Larsen],' the opposition clause.

*Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1312 (6th Cir. 1989). Instantly, Plaintiff alleges that his conduct falls within the opposition clause.

The Court finds that Plaintiff's conduct is not protected because he did not oppose unlawful employment discrimination by EDS, instead, he complained that his co-workers were offending him by making religious references. The instant case is analogous to *Booker v. Brown & Williamson Tobacco Co., supra*. In *Booker,* the plaintiff was demoted. After the plaintiff's demotion he wrote a letter to the defendant's human resource department contesting his supervisor's complaints against him, and alleged that it was a case of "ethnocism, which should be investigated immediately." *Id.* at 1309. The plaintiff brought an ELCRA retaliation claim

20

alleging that he was demoted because of his race. The Sixth Circuit found that plaintiff's letter

to defendant was not protected activity under the ELCRA[4] because he did not complain that the

defendant was participating in unlawful discrimination. The plaintiff pointed to an allegedly

racist statement made by his supervisor, to which the Sixth Circuit stated "this allegation is not

that [defendant] is engaging in unlawful employment practice, but that one of its employees has

a racial intolerance." *Id.* at 1313. Similarly, here, Plaintiff never complained to EDS that it was

engaging in religious discrimination, rather his complaints were directed towards his co-workers

emails and other activities. The Michigan Court of Appeals has also held that complaints about

unfair hiring and promotions were not protected activity because it did not allege that the

defendant employer's practices were illegal. *Cremonte v. State Police,* 232 Mich. App. 240

(Mich. App. 1998). Under these circumstances, the Court holds that Plaintiff did not engage in

protected activity under Title VII or the ELCRA because his complaints to EDS were based

upon his co-workers conduct and he never alleged that EDS engaged in unlawful discrimination,

therefore Plaintiff's retaliation claim fails.

        Further, even if Plaintiff engaged in protected conduct, Plaintiff has not shown that there

is a causal connection between the protected activity and the adverse employment action.

Plaintiff argues that the temporal proximity between his complaints and his discharge establish a

causal connection to his complaints. The Court finds that the Sixth Circuit has held that

temporal proximity can be a factor in establishing a causal connection, however temporal

proximity by itself is insufficient to establish a causal connection. *Skrajanc v. Great Lakes*

--------------------------------------------------

        [4]The Sixth Circuit came to this conclusion while analyzing case law under Title VII. See
*Booker* at 1311.

*Power Serv. Co.,* 272 F.3d 309, 317 (6th Cir. 2001).  The Plaintiff must demonstrate that his

protected activity was a significant factor in his discharge.  *Hollowell v. Michigan Consol. Gas*

*Co.,* 2001 WL 100627 *8 (6th Cir. August 24, 2001) (unpublished).  Because of Plaintiff's

performance problems noted above, the Court finds that Plaintiff has not shown that his

complaints about his co-workers religious messages were a significant factor in his discharge.

EDS has presented evidence demonstrating Plaintiff's lack of productivity.  Plaintiff was placed

on final warning relating to his performance and failing to follow his supervisor's orders to not

send a blanket email.  The Court finds that EDS has presented objective evidence demonstrating

that Plaintiff violated the terms of his final warning by his performance.  Accordingly, even if

the Court were to find that Plaintiff engaged in protected activity, the Court still finds that

Plaintiff has not established a causal connection between his complaints to EDS and his

discharge.   Accordingly, EDS is entitled to summary judgment on Plaintiff's Retaliation claim.

> **a.      Plaintiff's Arguments Relating to Berryhill's Statements and the EEOC**
> **Determination**

Plaintiff contends that Gayle Berryhill's statements are inadmissible hearsay under

Federal Rule of Evidence 802 which provides that hearsay is not admissible.  Federal Rule of

Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while

testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

The Court finds that notes and performance evaluations written by Berryhill are not hearsay

because EDS is not offering them for the "truth of the matter asserted," but rather to show

Lesperance's state of mind when she made the decision to discharge Plaintiff.  As the Eight

Circuit has held:

> [i]n employment discrimination cases, internal documents relied upon by the employer in making an employment decision are not hearsay as that term is defined in Fed. R. Evid. 801(c) - - statements offered to prove the truth of the matters asserted. Rather, such documents are relevant and admissible because they help explain (or may help explain) the employer's conduct. See *Hardie v. Cotter & Co.,* 849 F.2d 1097, 1101 (8th Cir. 1988); *Jones v. Los Angeles Comm. College Dist.,* 702 F.2d 203, 205 (9th Cir. 1983); *Moore v. Sears, Roebuck & Co.,* 683 F.2d 1321, 1322 (11th Cir. 1982).

(*Id.* at 685). Further, the Court in *Ross v. William Beaumont Hosp.,* 678 F. Supp. 655 (E.D. Mich. 1988) held that materials in plaintiff's personnel file "could not be used to prove the truth of the matters asserted therein, but were admissible "to identify the reports that [defendant] relied upon in deciding to terminate [the plaintiff]." (*Id.* at 661, fn. 11). The Court finds that Berryhill's notes and performance evaluations are admissible because they are not being offered for the truth of the matter asserted. The Court finds that these reports are admissible and probative to the EDS' management's state of mind when Plaintiff was discharged (i.e. what Lesperance relied upon in deciding to terminate Plaintiff). The Court also finds that Berryhill's notes and performance evaluations are admissible under FRE 803 (6) which provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (6) Records of Regularly Recorded Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnosis, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian, or other qualified witness, or by certification that complies wit Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph, includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

FRE 803(6). Plaintiff argues that Berryhill's notes and evaluations "indicate a lack of trustworthiness" and therefore should be excluded. Plaintiff points to the fact that Lesperance

later fired Berryhill in part because she misrepresented the nature of GM's complaints regarding EDS' services.  (Lesperance Dep. at 57-63).  Because of these representations, Plaintiff contends that Berryhill's notes and evaluations should be excluded due to lack of trustworthiness.  The Court finds that Plaintiff asserts an overly broad interpretation of the "trustworthiness" exclusion in FRE 803(6).  As EDS points out, Plaintiff's interpretation of the "trustworthiness" requirement would exclude records prepared by someone who had ever purportedly misrepresented facts substantively and temporally unrelated to the preparation of the business records at issue.  The Court finds that courts have excluded evidence based on "lack of trustworthiness" where it is shown that the source had a motive to fudge the records, not where the source allegedly misrepresented facts relating to another issue at another time.  See *AMPAT/MIDWEST, Inc., v. Illinois Toolworks, Inc.,* 896 F.2d 1035, 1045 (7th Cir. 1990); *Solomon v. Shuell,* 435 Mich. 194 (1990).  The burden is on the objecting party to show reasons that make the record untrustworthy.  *Wheeler v. Sims,* 951 F.2d 796, 803 (7th Cir. 1992).  Here, Berryhill's unrelated misrepresentations are insufficient to demonstrate untrustworthiness.  Therefore, Berryhill's statements are admissible under FRE 803(6).

Plaintiff also contends that the EEOC findings are admissible and support its position that Plaintiff was terminated and retaliated against because of religion.[5]  On the other hand, the Court finds that the EEOC probable cause determination is insufficient to create a genuine issue of

---

[5]The EEOC determination found a probable cause finding that Plaintiff was discharged on the account of his expressed religious views.  (Plaintiff's Response, Ex. 6).  EDS argues that the EEOC findings have not been authenticated, and are therefore inadmissible under Federal Rule of Civil Procedure 56(e).  The Court finds that the EEOC determination has been authenticated.  EDS brings forth no specific evidence disputing the contents of Plaintiff's attached EEOC charge.

material fact regarding Plaintiff's discrimination claims.  The Sixth Circuit in finding that the

district court did not abuse its discretion in excluding a EEOC probable cause determination has

provided:

> the plaintiff completely failed to articulate to the district court any persuasive rationale
> for admitting the document, arguing only that it was relevant to proving the existence of a
> *prima facie* claim.  There being, then, little if any basis for the district court to conclude
> that the report had any probative value, even a minimal prejudicial effect would merit
> excluding the report.

*Williams v. The Nashville Network,* 132 F.3d 1123, 1129 (6th Cir. 1997).   Similarly, in *Ricker v.

Food Lion, Inc.,* 3 Fed. Appx. 227 (6th Cir. 2001) (unpublished January 23, 2001)[6], the district

court granted defendant's motion for summary judgment on the plaintiff's age discrimination

and sex discrimination claims.  The district court refused to consider an EEOC determination

which found an age discrimination violation in deciding the defendant's summary judgment

motion. The Sixth Circuit held that the district court did not err in refusing to consider the EEOC

determination.  The Court stated:

> the district court here did not abuse its discretion in declining to admit the EEOC cause
> determination.  Despite refusing to consider the document itself, the district court
> nevertheless considered the same evidence presented to the EEOC, and thus, the cause
> determination was of little, if any, probative value.

(*Id.* at 231).

Similarly, in the instant case, the EEOC determination has little, if any, probative value

relating to Plaintiff's claim that EDS' reason for his discharge is pretextual.  The Court has

---

[6]See also *Churney v. Village of Downers Grove,* 122 F. Supp. 2d. 921 (N.D. Ill. 2000).  In
*Churney,* the plaintiff brought a retaliation claim stemming from her sex discrimination charge
brought before the Illinois Department of Human Rights.  The defendant wanted to bring forth
evidence showing that her that her sex discrimination charge before the Illinois Department of
Human Rights was dismissed for lack of evidence.  The Court declined to admit the evidence
and held that the only relevant aspect of the charge was the fact that it was filed.

before it the same evidence which was presented to the EEOC. Accordingly, the Court deems

the EEOC determination insufficient for Plaintiff to survive summary judgment.

**CONCLUSION:**

     The Court grants EDS' motion for summary judgment in its entirety.

**SO ORDERED.**


                    s/Paul D. Borman_____
                    PAUL D. BORMAN
                    UNITED STATES DISTRICT JUDGE

Dated: June 13, 2005

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on June 13, 2005.


                    s/Jonie Parker_____
                    Case Manager